## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **REBECCA E. ADAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 12-CV-567-PJC** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of the** | ) | |
| **Social Security Administration,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Claimant, Rebecca E. Adams ("Adams"), pursuant to 42 U.S.C. § 405(g), requests

judicial review of the decision of the Commissioner of the Social Security Administration

("Commissioner") denying her application for supplemental security income benefits under Title

XVI of the Social Security Act, 42 U.S.C §§ 401 *et seq*.  In accordance with 28 U.S.C. §

636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge.

Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.  Adams appeals

the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred

because the ALJ incorrectly determined that she was not disabled.  For the reasons discussed

below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting
Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as
Defendant in this action. No further action need be taken to continue this suit by reason of the
last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**Claimant's Background**

Adams was 45 years old at the time of the hearing before the ALJ on December 16, 2009. (R. 26).  After graduation from high school, Adams took some college classes, and she received training as a certified nurse's assistant.  (R. 31-32, 35).  Adams worked as a nurse's aide.  (R. 35).  At the hearing, Adams testified that she was five feet tall and weighed 240 pounds.  (R. 28-29, 53).  She said that her weight fluctuated from 230 to 255 pounds.  (R. 53-54).  Adams smoked one to two packs of cigarettes a day, but there were times when she would not smoke for a month or two.  (R. 32, 34).

Adams testified that she had neck problems and had surgery on two vertebrae with hardware.  (R. 36-37).  She continued to experience pain on a daily basis after the surgery.  (R. 37).  Most of her pain was on the right side of her body.  (R. 39, 44-45).  She said that her pain radiated from the back of her head and into her shoulders, back, arms, and hands.  (R. 38-39, 41-43).  Several times a week, Adams experienced pain in her right shoulder and arm.  *Id.*  She could not remember injuring her right shoulder, but she believed that it may have occurred during a fall.  (R. 45).  Adams said that her hands felt numb and tingly every day.  (R. 39-41).  She reported that it was difficult for her to write or to type with her right hand.  (R. 41).  She tried to massage her hands to alleviate her numbness.  *Id.*  Cold weather increased Adams's pain.  (R. 37-38).

Adams said that she suffered back pain on a daily basis.  (R. 44-45).  She had been told that she was in need of having three discs in her back replaced.  (R. 42).  She had spasms, numbness, and tingling in the middle of her back.  (R. 42-44).  Adams reported that her symptoms were so bad that they knocked the breath out of her.  (R. 43).  She said that her pain extended down her back and into her hips, knees, and legs.  (R. 42-44).  After sitting for an

2

extended period of time, Adams had to stand up to get the blood circulating in her legs.  (R. 43).

During the hearing, Adams said that her right leg felt tingly, because she had not moved around.

*Id.*  She had fallen in the past due to the numbness in her legs.  (R. 44).  On one occasion, she

injured her right knee when her leg gave out.  *Id.*  After the injury, she continued to have pain,

swelling, and a tingling sensation in her right knee.  (R. 44-46).  Adams said that after walking a

short distance, her knee would feel like it was going to give out.  (R. 45).  Adams reported that

she had been prescribed a Tens Unit[2] and that it helped to improve her knee pain.  (R. 46-47).

Adams said that she had headaches two to three days a week due to her neck pain.  (R.

48-49).  Her headaches affected her vision and made it hard for her to read.  (R. 49).  Adams

occasionally had headaches that lasted all day and were "unbearable."  (R. 49-50).  When she had

a bad headache, she had to take her medication and "sleep it off."  (R. 50).  She once had a

headache that lasted for about four days.  *Id.*  Medication helped to improve Adams's headaches,

but she continued to experience them two to three times a week.  (R. 48-49).

Adams testified to problems with gastroesophageal reflux disease ("GERD") and daily

symptoms of nausea.  (R. 50-52).  Her symptoms were better when she was lying down and

propped up.  (R. 53).  Her doctors had advised her to change her diet and to lose weight.  (R. 51-

52).  Adams testified that she had not tried to lose weight, because she ate when she was nervous.

(R. 54).

Adams testified that she had symptoms of depression and bipolar disorder.  (R. 58-59).

Adams had a hard time getting out of bed in the mornings when she was depressed.  (R. 59).  She

said that she had difficulty sleeping and she woke up feeling unrested and fatigued.  (R. 59, 68).

---

[2] A Tens Unit involves the use of transcutaneous electrical nerve stimulation.  Taber's
Cyclopedic Medical Dictionary 1962 (17th ed. 1993).

Adams reported that she had difficulty with racing thoughts and with her short-term memory. (R. 59-60). She had problems starting things and not completing them. (R. 60). Adams reported that she had obsessive compulsive disorder, and she gave examples of "hoarding" behavior and repeatedly checking the doors and the stove at night. (R. 61).

After Adams's surgery, she had a problem with overusing her pain medication. (R. 66-67). Adams's pain would occasionally be so bad that she took 10 to 20 Lortab pills a day. (R. 67-68). Her doctor had counseled her about the large amounts of her pain medications she used. *Id.* At the time of the hearing, Adams was regulating the amount of her medications. *Id.* The side effects of her medication caused her to feel drowsy and gave her dry mouth. (R. 68).

Adams said that she spent a lot of her time lying on the couch watching television. (R. 62). It was uncomfortable for her to sit in a chair. *Id.* She said that she had difficulty standing for longer than five minutes. *Id.* After walking half-a-block, Adams would be short of breath, and her back and knees would be hurting. (R. 63). She was unable to bend down to touch her toes. *Id.* Adams took frequent breaks while doing housework because of the numbness in her legs. (R. 62). Her family occasionally helped her with the housework and shopping. (R. 70). She used an electric cart when she shopped. (R. 45). Adams testified that she could not lift 10 pounds from the floor, but she could lift 10 pounds from a table. (R. 64-65). She needed help getting 10 pounds of potatoes into and out of her car. *Id.* For social activities, Adams's friends visited her, and she did errands and went to a restaurant twice a month. (R. 68-69). Adams said that she had problems reaching over her head. (R. 63). She had cut her hair shorter because it was difficult for her to wash it. *Id.* Adams sat in a chair to bathe. (R. 64).

Adams was examined by Eric W. Sherburn, M.D. with Oklahoma Spine & Brain Institute on January 4, 2005. (R. 231-32). Adams had complaints of chronic low-back pain, neck pain,

and migraine headaches.  (R. 231).  Dr. Sherburn's diagnosis was mild disk bulge at C6-C7, and

he recommended surgery.  (R. 230, 239-40).  On April 5, 2005, Dr. Sherburn performed an

anterior cervical diskectomy and fusion at levels C5-C6 and C6-C7.  (R. 245-55).  Dr. Sherburn

continued to treat Adams through May 2006 for persistent headaches, and pain in her neck, back,

and lower extremities.  (R. 225-29).  On May 2, 2006, Dr. Sherburn's diagnoses were solid

arthrodesis[3] and left C8 radiculopathy.  (R. 226).

John R. Cattaneo, M.D., of OU College of Medicine in Tulsa performed a neurological

examination of Adams on December 18, 2006.  (R. 217-19).  Adams complained of headaches

and a tingling sensation in her legs and knees.  (R. 217).  Dr. Cattaneo found that Adams's

symptoms were most consistent with severe migraine headaches.  (R. 218).  He felt that the

tingling in her legs was most likely due to her medication.  *Id.*  He recommended that she stop

smoking due to the effects on her headaches and general health.  *Id.*

Michael Ryan Vaclaw, M.D., examined Adams for multiple complaints on June 22, 2007.

(R. 339-41).  Dr. Vaclaw's diagnoses were chest pain, low back pain, and GERD.  (R. 340).

---

[3] Arthrodesis is the surgical fusion of a joint.  Dorland's Illustrated Medical Dictionary
159 (31st ed. 2007).

On August 29, 2007, Adams was examined by Anton A. Surja, M.D.  (R. 350).  Dr. Surja's diagnoses were mood disorder, not otherwise specified; obesity; migraine headaches; and degenerative joint disease.  *Id.*  Adams's Global Assessment of Functioning ("GAF")[4] was stated as 55.  *Id.*

Adams presented to C. Scott Anthony, D.O., for increased low back pain on September 24, 2007.  (R. 262-63).  Adams told Dr. Anthony that she believed her pain was due to her significant weight gain.  (R. 262).  Adams attributed her weight gain to stress.  *Id.*  Dr. Anthony diagnosed sacroiliac joint arthropathy.  *Id.*

On September 29, 2007, Dr. Surja's diagnoses were mood disorder; bipolar disorder, not otherwise specified; obesity; migraine headaches; and degenerative joint disease.  (R. 349).  Dr. Surja referred Adams for vocational rehabilitation.  *Id.*  At Adams's appointment on November 5, 2007, she weighed 248 pounds.  (R. 348).  Dr. Surja omitted bipolar disorder, but otherwise continued his prior diagnoses.  *Id.*

On April 17, 2008, Dr. Vaclaw treated Adams for persistent cough and sharp pain in her right knee radiating to her hip.  (R. 303-05).  Adams's recorded weight was 245 pounds.  (R. 305).  Dr. Vaclaw diagnosed Adams with acute sinusitis and strain of her right knee.  (R. 304).

---

[4] The GAF score represents Axis V of a Multiaxial Assessment system.  Diagnostic and Statistical Manual of Mental Disorders 32-36 (Text Revision 4th ed. 2000) (hereinafter "DSM IV")*.*  A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32.  The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34.  A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.*  A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id.*

Adams saw David King, D.O. for complaints of right hand and knee pain from June 2008 to September 2008, and she was given pain medication.  (R. 295-99, 352-56).

Kyle D. Craig, M.D., evaluated Adams on September 11, 2008.  (R. 359).  Adams's weight was 248 pounds.  *Id.*  Dr. Craig discussed Adams's use of narcotic medications.  *Id.*  His diagnoses were right knee osteoarthritis, bipolar disorder, GERD, and migraine headaches.  *Id.*

Adams presented to the emergency room at Jane Phillips Medical Center ("Jane Phillips") on November 14, 2008 and December 26, 2008 for a cough, pharyngitis, and headaches.  (R. 415-17, 423-25).  On December 28, 2008, Adams returned to Jane Phillips for ongoing symptoms and was admitted to the hospital for observation.  (R. 401-05).  She was discharged on December 29, 2008, with diagnoses of community-acquired pneumonia; severe headaches; tension headache versus atypical migraine; morbid obesity; chronic abnormal chest x-ray findings; and history of migraine headaches.  (R. 402-03).

On December 30, 2008, Adams returned to Jane Phillips with complaints of worsening cough, fatigue, and shortness of breath.  (R. 406-08).  She was diagnosed with bilateral infiltrate and admitted to the hospital.  (R. 406).  Dr. Craig treated Adams during her hospital stay.  (R. 407).  Dr. Craig counseled Adams about her dependency on narcotic pain medication, the risk of her developing diabetes, and the need for her to lose weight.  *Id.*  In Dr. Craig's notes, he reported that he advised Adams that her weight loss was a long-term priority, and he wrote that she understood.  *Id.*  At her discharge on January 4, 2009, Adams's diagnoses were sepsis; community-acquired pneumonia; newly-diagnosed hypertension; chronic pain; narcotic dependency; morbid obesity; and migraine headaches.  (R. 406).

From February 2009 through December 2009, Adams continued to be seen at Jane Phillips for sore throat, congestion, back pain, right knee pain, and bilateral hip pain. (R. 394-99, 430-32, 488-99, 502-11).

Nonexamining agency consultant Suzanne Roberts, M.D., completed a Physical Residual Functional Capacity Assessment on March 25, 2008. (R. 264-71). For exertional limitations, Dr. Roberts found that Adams could perform light work. (R. 265). In the space for narrative explanation, Dr. Roberts noted Adams's 2005 neck surgery as well as her history of treatment for migraine headaches and back pain. *Id.* Dr. Roberts's opinion was that Adams could perform the requirements of light work, with no overhead work. *Id.* She specified that she considered Adams's prior cervical fusion, pain, and obesity in forming her opinions. *Id.* For manipulative limitations, Dr. Roberts found that Adams was limited in her ability to reach in all directions with no overhead work due to her prior cervical fusion. (R. 267). No further limitations were established. (R. 267-68).

Carmen Bird, M.D., agency nonexamining consultant, completed a second Physical Residual Functional Capacity Assessment on February 17, 2009. (R. 376-83). Dr. Bird determined that Adams could occasionally lift and carry 10 pounds, and frequently lift and carry less than 10 pounds; that she could stand and walk for about 2 hours in an 8-hour work day; that she could sit for a total of 6 hours in an 8-hour work day; and that she had no restrictions on pushing and pulling. (R. 377). In the space for narrative explanation, Dr. Bird noted Adams's 2005 neck surgery, as well as her treating history for migraine headaches, prior back surgery, and right knee pain. (R. 377-78). She noted an examination of September 11, 2008 that showed Adams's gait was normal. (R. 378). She noted a bone scan of July 23, 2008 that showed degenerative changes in both shoulders, cervical spine, right knee, and, mildly, in both ankles.

8

*Id.* Dr. Bird's said that this RFC reflected Adams's history of cervical fusion and degenerative joint disease of the shoulders and right knee. *Id.* For manipulative limitations, Dr. Bird found that Adams had limited ability reaching in all direction, with "[n]o overhead reaching of the right shoulder." (R. 379). She found no postural, visual, communicative, or environmental limitations were established. (R. 378-80).

Agency consultant Jeri Fritz, Ph.D., conducted a mental status examination of Adams on April 16, 2008. (R. 272-75). In the examination, Adams reported that she was hospitalized in 1995 and diagnosed with bipolar disorder. (R. 272). She reported hospitalization in 2006 after a suicide attempt that she described as caused by her chronic pain. (R. 273). Adams said that she was afraid to leave her house, because she did not like to be around people. *Id.* She was able to perform her own activities of daily living. *Id.* Adams stated that she did not do many activities because it was "too much trouble to clean up and shower." *Id.* She said that she spent most of her time on the couch. *Id.* Adams told Dr. Fritz that her pain limited her ability to function. (R. 274).

Dr. Fritz noted that Adams ambulated slowly with the aid of a cane. (R. 273). She noted that Adams's affect was blunted. *Id.* She found Adams's attention and concentration were within normal limits. *Id.* She estimated Adams's intellect was within the low average range of functioning. *Id.* She also found that Adams's long-term memory appeared within normal limits, but that her short-term memory was impaired. *Id.* Dr. Fritz found that Adams could understand, retain, and follow directions, and could perform simple, repetitive tasks. (R. 274). She found Adams's ability to handle the stress of daily interactions was poor due to her chronic pain, anxiety, and depression. *Id.* Dr. Fritz's diagnosis was bipolar disorder, most recent episode

depressed, per history.  (R. 274).  She assessed Adams's GAF as 60 for the current year and 50

for the past year.  *Id.*

Nonexamining agency consultant Cynthia Kampschaefer, Psy.D., completed a Psychiatric

Review Technique form and a Mental Residual Functional Capacity Assessment on May 9, 2008.

(R. 276-93).  On the Psychiatric Review Technique form, for Listing 12.04, Dr. Kampschaefer

noted Adams's mood disturbance with bipolar disorder.  (R. 276, 279).  For Listing 12.06, she

noted Adams's anxiety and obsessive compulsive traits.  (R. 276, 281).  For the "Paragraph B

Criteria,"[5] Dr. Kampschaefer assessed Adams with mild restriction of her activities of daily

living, moderate difficulties in maintaining social functioning, and no difficulties in maintaining

concentration, persistence or pace, with no episodes of decompensation.  (R. 286).  In the

"Consultant's Notes" portion of the form, Dr. Kampschaefer noted Adams's report of a

hospitalization in 1995 for bipolar disorder.  (R. 288).  Dr. Kampschaefer briefly summarized Dr.

Fritz's report, including that Dr. Fritz determined that Adams's activities of daily living appeared

to be limited mostly by her pain.  *Id.*

In her Mental Residual Functional Capacity Assessment, Dr. Kampschaefer found that

Adams was markedly limited in her ability to understand, remember, and carry out detailed

instructions.  (R. 290).  Dr. Kampschaefer also found Adams to be markedly limited in her ability

to interact appropriately with the general public.  (R. 291).  She found no other significant

---

[5] There are broad categories known as  the "Paragraph B Criteria" of the Listing of
Impairments used to assess the severity of a mental impairment.  The four categories are (1)
restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3)
difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of
decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R.
Part 404 Subpt P, App. 1 ("Listings") § 12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264,
1268-69 (10th Cir. 2008).

limitations.  (R. 290-91).  Dr. Kampschaefer said that Adams could perform simple tasks with routine supervision.  (R. 292).  Adams could relate to supervisors and peers on a superficial work basis, and she could adapt to a work situation.  *Id.*  Adams could not relate to the general public. *Id.*

Nonexamining agency consultant, Laura Lochner, Ph.D., completed a second Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment on February 13, 2009.  (362-75).  For Listing 12.04, Dr. Lochner noted Adams's mood disturbance, but marked that there was insufficient evidence to substantiate the presence of the disorder.  (R. 362, 365). Dr. Lochner also found there was insufficient evidence to determine the Paragraph B Criteria. (R. 306).  In the "Consultant's Notes" portion of the form, Dr. Lochner reported that she was unable to evaluate Adams's current mental status and her activities of daily living, because Adams had missed two previously scheduled appointments for her evaluation.  (R. 374).

In her Mental Residual Functional Capacity Assessment, Dr. Lochner found that Adams was markedly limited in her ability to understand, remember, and carry out detailed instructions. (R. 310).  Dr. Lochner also found Adams to be markedly limited in her ability to interact appropriately with the general public.  (R. 311).  She found no other significant limitations.  (R. 310-11).  Dr. Lochner said that Adams could perform simple tasks, she could relate to others in a superficial manner, she could not relate to the general public, and she could adapt to a work situation.  (R. 312).

On March 26, 2010, agency consultant Marion Sigurdson, Ph.D., completed a psychological evaluation of Adams.  (R. 525-35).  Dr. Sigurdson's Axis I[6] diagnoses were

---

[6] The multiaxial system "facilitates comprehensive and systematic evaluation."  DSM-IV 27.

bipolar disorder, anxiety disorder, and chronic pain syndrome associated with both psychological factors and a general medical condition. (R. 531). Adams's GAF was assessed as 55. *Id.* Dr. Sigurdson said that Adams's long-term prognosis was guarded. *Id.*

Dr. Sigurdson completed a Mental Status Source Statement. (R. 532-34). He determined that Adams would have a moderate limitation in her ability to complete a normal work day and work week without interruptions from her psychologically based symptoms and in her ability to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 533). He found Adams would have a moderate limitation in her ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. *Id.*

### Procedural History

In August 2008, Adams filed an application for Title XVI supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C §§ 401 *et seq*. (R. 137-39). Adams's application was denied initially and upon reconsideration. (R. 90-96). A hearing before ALJ John W. Belcher was held on December 16, 2009, in Tulsa, Oklahoma. (R. 24-79). By decision dated June 25, 2010, the ALJ found that Adams was not disabled. (R. 13-23). On August 10, 2012, the Appeals Council denied review of the ALJ's findings. (R. 1-4). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[7]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the Commissioner's

---

[7] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.* (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Commissioner

At Step One, the ALJ found that Adams had not engaged in substantial gainful activity since August 22, 2008, the application date. (R. 15)*.* At Step Two, the ALJ found that Adams had severe impairments of status post cervical spine diskectomy and fusion; GERD; obesity; degeneration of right knee; bipolar disorder; narcotic dependency; degenerative joint disease of right shoulder; nicotine abuse; and chronic bronchitis / intermittent pneumonia. *Id.* At Step Three, the ALJ found that Adams's impairments, or combination of impairments, did not meet the requirements of a Listing. (R. 17).

The ALJ determined that Adams had the RFC to perform a range of sedentary work, with postural and environmental limitations, as well as a limitation to "only superficial contact with coworkers and limited moderately complex tasks." (R. 18-19). The ALJ also limited Adams to occasionally "reach above head bilaterally." *Id.* At Step Four, the ALJ found that Adams could not perform any past relevant work. (R. 21). At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Adams could perform, considering her age,

14

education, work experience, and RFC.  (R. 22).  Thus, the ALJ found that Adams was not

disabled from August 22, 2008.  (R. 23).

## Review

Adams presents three arguments.  First, she says that the ALJ "substituted his opinion for

that of [her] physicians" due to comments he made during the hearing.  Plaintiff's Opening Brief,

Dkt. #16, p. 3.  Second, Adams asserts that the ALJ failed to properly evaluate her obesity. *Id.*

As a third argument, Adams says that the ALJ's RFC determination was not supported by

substantial evidence, but her argument specifies that the ALJ erred in his failure to incorporate

the opinion of nonexamining consultant Dr. Bird specifying "no overhead reaching of the right

shoulder."  *Id.*  The Court agrees with Adams that the ALJ did not sufficiently explain why he

did not incorporate the overhead reaching limitation found by Dr. Bird in his RFC determination,

and therefore reversal is required to allow the ALJ to make this explanation.  Because reversal is

required on this issue, the other issues raised by Adams are not considered.

Regarding opinion evidence, generally the opinion of a treating physician is given more

weight than that of an examining consultant, and the opinion of a nonexamining consultant is

given the least weight.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  The

regulations of the Social Security Administration require that "[r]egardless of its source, we will

evaluate every medical opinion we receive."  20 C.F.R. § 416.927(d); *see also* SSR 96-5p, 1996

WL 374183.  An ALJ must consider the opinion evidence and, if he rejects it, he must provide

specific legitimate reasons for the rejection.  *Doyal v. Barnhart*, 331 F.3d 758, 763-64 (10th Cir.

2003)*; Victory v. Barnhart*, 121 Fed. Appx. 819, 825 (10th Cir. 2005) (unpublished).  If an ALJ's

RFC determination conflicts with a medical opinion, then the ALJ must explain why the opinion

was not adopted.  *Sitsler v. Barnhart*, 182 Fed. Appx. 819, 823 (10th Cir. 2006) (unpublished),

*citing* SSR 96-8p, 1996 WL 374184; *Ramirez v. Astrue*, 255 Fed. Appx. 327, 332-33 (10th Cir. 2007) (unpublished) (directing ALJ on remand to make specific findings explaining why he did not adopt opinions of consulting examiner).

The Court agrees with Adams that the ALJ erred by failing to include in his RFC determination the limitations nonexamining consultants Dr. Roberts and Dr. Bird made regarding Adams's ability to do overhead work or to reach overhead with her right shoulder. *Haga v. Astrue*, 482 F.3d 1205 (10th Cir. 2007). The claimant in *Haga* had numerous physical and mental impairments, and the ALJ had included nonexertional restrictions in his RFC determination, limiting the claimant to "simple repetitive tasks" with "only incidental contact with the public," and "no requirement for making change." *Id.* at 1207. A consultant had completed an RFC form indicating that the claimant was moderately impaired in seven functional categories. *Id.* The claimant argued that the ALJ had implicitly rejected the consultant's opinion by failing to include any accommodations in his RFC determination that addressed the consultant's assessment that the claimant had moderate difficulty in her ability to deal appropriately with supervisors and coworkers and to respond appropriately to workplace pressures and changes. The ALJ had given no explanation relating to why he did not address some of the consultant's findings of moderate restrictions while including others, and the Tenth Circuit agreed that this omission required reversal so that the ALJ could explain the evidentiary support for his RFC determination. *Id.* at 1207-08.

Here, the ALJ included in his RFC determination only a limitation to occasionally "reach above head bilaterally." (R. 18-19). When discussing the opinion evidence, however, the ALJ said that he gave Dr. Bird's assessment "significant weight." (R. 21). As the Tenth Circuit made clear in *Haga*, the ALJ cannot adopt most of Dr. Bird's limitations and reject one without

explanation.  The case must be reversed in order to allow the ALJ to explain why he did not

adopt Dr. Bird's limitation of "no overhead reaching of the right shoulder."

Because the Court finds that reversal is required based on the ALJ's failure to explain

why he did not incorporate Dr. Bird's reaching limitation into his RFC, the Court does not take a

position on any of the other issues raised by Adams.  The Court notes, however, that the ALJ

made extensive comments about Adams's obesity and smoking that are troubling.[8]  In *Qualls v.*

*Astrue*, 428 Fed. Appx. 841, 849 (10th Cir. 2011) (unpublished), the Tenth Circuit addressed the

claimant's argument that the ALJ had demonstrated bias by two comments he made at the

beginning of the administrative hearing.  The court noted that the ALJ enjoyed a presumption of

honesty and integrity.  *Id.*  The court agreed with the Commissioner's characterization of these as

"stray" comments that did not show bias when viewed in the context of the entire hearing.  *Id.*

*See also Shivel v. Astrue*, 260 Fed. Appx. 88, 92-93 (10th Cir. 2008) (unpublished) (isolated

evidentiary ruling that was "troubling" was not substantial evidence of bias).  The Tenth Circuit

has stated that the court will direct reassignment[9] of a case to another ALJ only "in the most

---

[8] During the hearing, the ALJ interrupted questioning by Adams's attorney and asked
Adams why she was not trying to lose weight.  (R. 54).  He said that losing weight should be a
priority to her and that a lot of her symptoms might go away if she lost weight.  (R. 54-55).  He
said that she didn't seem to care about her own health, and he commented on a sports drink that
Adams had with her at the hearing.  (R. 55-56).  He then began telling her about the effects of her
smoking and said that she was going to have to wheel an oxygen tank with her in the future.  (R.
56-58).  He then said that her anxiety might improve if she didn't smoke.  (R. 58).  The ALJ then
said he was sorry and that "I was pretty hard on you," and went off the record so that the parties
could take a break.  *Id.*

[9] Apparently there is some conflict among federal district courts and courts of appeal
regarding the power of a court to order or to direct that a case be assigned to a new ALJ on
remand.  A court in the Eastern District of New York attempted to collect some of the conflicting
cases in *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 291-92 (E.D.N.Y. 2004).  *Sutherland* has
been cited by several district courts within the Tenth Circuit.  *See, e.g., Brown v. Astrue*, 2011
WL 5356806 at *1 (D. Kan.); *Chamblin v. Astrue*, 2010 WL 3843031 at *3 (D. Colo.).

unusual and exceptional circumstances." *Miranda v. Barnhart*, 205 Fed. Appx. 638, 644 (10th Cir. 2005) (unpublished).  Adams has not requested that this Court order that the Commissioner assign a new ALJ to her case on remand, and therefore this Court need not directly address this issue.  The Court notes, however, that the Social Security Administration has provided a procedure for claimants to object to an ALJ and thereby implicitly to request reassignment to a new ALJ.  *See* 20 C.F.R. § 404.940.

On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Adams.

This Court takes no position on the merits of Adams's disability claim, and "[no] particular result" is ordered on remand.  *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993).  This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case.  *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 21st day of October 2013.

Paul J. Cleary
United States Magistrate Judge

18